[Nos. A103046, A103742. First Dist., Div. Four. Oct. 29, 2004.]

ROBERT KRUMME, Plaintiff and Respondent, v.
MERCURY INSURANCE COMPANY et al., Defendants and Appellants.

COUNSEL

Douglas L. Hallet, Joseph B. Miller, Marc J. Levine and Victor Poltrock for Defendants and Appellants.

Levy, Ram & Olson, Arthur D. Levy, Heather M. Mills and Norman Goldman for Plaintiff and Respondent.

Gary M. Cohen, Jose S. Aguilar and Jon A. Tomashoff for California Insurance Commissioner as Amicus Curiae on behalf of Plaintiff and Respondent.

Piper Rudnick, Margaret L. Parker, Jeffrey M. Hamerling, Lisa M. Sitkin and Kari S. Gregory for American Agents Alliance as Amicus Curiae on behalf of Defendants and Appellants.

## OPINION

**KAY, P. J.—** ■ Insurance Code section 1704[1] requires that certain kinds of insurance may be sold only by what are known as "appointed agents"— persons for whom the insurer has filed with the Insurance Commissioner a notice of appointment formally designating the person to act on the insurer's behalf. A trio of related insurers (which for purposes of simplicity will hereinafter be collectively referred to as Mercury) sold policies of automobile insurance within the state through "broker-agents" who are not appointed agents. Suit was instituted to stop this practice, as well as permitting the "broker-agents" to charge consumers broker fees added to the advertised price of insurance. The trial court determined that both of these practices ran afoul of the unfair competition law (UCL) (Bus. & Prof. Code, § 17200 et seq.) and permanently enjoined them.

The primary issue pressed by Mercury is whether its practice of employing broker-agents who are not appointed agents has been sanctioned by the Legislature and therefore enjoys a "safe harbor" from liability under the UCL. Although the issue is not free from all doubt, on balance it appears from the governing statutes, particularly section 1704(a), that the Legislature has not created a safe harbor for this practice. We therefore affirm.

## BACKGROUND

The trial court's findings of fact and conclusions of law are best comprehended in light of the extensive statutory history that underpins the trial court's reasoning. That history involves the evolution of the concepts of broker and agent in the insurance context.

### (A)

■ Statutorily, an agent is defined as one who is "authorized, by and on behalf of an insurer, to transact all classes of insurance" except for life

---

[1] Statutory references are to this code unless otherwise indicated. The precise part of section 1704 that will figure prominently on this appeal is subdivision (a). For purposes of brevity we shall refer to it as 1704(a).

insurance (§§ 31, 1621) while a broker is "a person who, for compensation and on behalf of another person, transacts insurance other than life with, but not on behalf of, an insurer." (§§ 33, 1623.)

■ One of the leading treatises explains the fundamental distinction between an agent and a broker in these terms: "An 'insurance broker' is one who acts as a middleman between the insured and the insurer, soliciting insurance from the public under no employment from any special company, and, upon securing an order, placing it with a company selected by the insured or with a company selected by himself or herself; whereas an 'insurance agent' is one who represents an insurer under an employment by it. A broker is, in essence, employed in each instance as a special agent for a single purpose, while the very definition of agent indicates an ongoing and continuous relationship. . . . [B]rokers and insureds are ordinarily involved in what can be viewed as a series of discrete transactions, while agents and insureds tend to be under some duty to each other during the entire length of the relationship." (3 Couch on Insurance (3d ed. 1997) § 45:1, pp. 45-3 to 45-4, fns. omitted; see 7 Appleman on Insurance 2d (Holmes ed. 1998), § 44.2, pp. 2–11; Croskey et al., Cal Practice Guide: Insurance Litigation (The Rutter Group 1997) ¶¶ 2:2–2:7, pp. 2-1 to 2-3 (rev. # 1, 2004.) In 1976 one Court of Appeal held that a broker is not an agent of the insurer, but is an independent contractor acting as agent for the insured. "The most definitive characteristic of an insurance agent is his authority to bind his principal, the insurer; an insurance broker has no such authority . . . . [T]he broker does not have authority to bind an insurer and . . . the insurance company must first execute the binder or policy; a broker does not execute a policy without a prior authorization from the insurer. In contrast, the agent is authorized to execute the binder himself." (*Marsh & McLennan of Cal., Inc. v. City of Los Angeles* (1976) 62 Cal.App.3d 108, 117–118 [132 Cal.Rptr. 796].)

■ "An individual cannot act as an insurance agent in California without a valid license issued by the commissioner of insurance. (Ins. Code, § 1631.) In addition to possessing a license, an insurance agent must be authorized by an insurance carrier to transact insurance business on the carrier's behalf. This authorization must be evidenced by a notice of agency appointment on file with the Department of Insurance. (Ins. Code, § 1704, subd. (a).)" (*Loehr v. Great Republic Ins. Co.* (1990) 226 Cal.App.3d 727, 732–733 [276 Cal.Rptr. 667].) Unlike an agent, a broker does not act for the insurer, and the insurer is not liable for the broker's acts or omissions. (E.g., *Kurtz, Richards, Wilson & Co. v. Insurance Communicators Marketing Corp.* (1993) 12 Cal.App.4th 1249, 1257–1258 [16 Cal.Rptr.2d 259]; *Reid v. Northern Assur. Co.* (1923) 63 Cal.App. 114, 127 [218 P. 290].) Because a broker, unlike an appointed agent, does not have the insurer available as a source of compensation for aggrieved insureds, the broker is required to post a bond before being allowed to operate. (§ 1662.)

Nevertheless, there is no absolute dichotomy between agents and brokers. In 1917, in a noninsurance context, our Supreme Court recognized that a person could be the agent of both parties to a commercial transaction. (*Glenn v. Rice* (1917) 174 Cal. 269, 272 [162 P. 1020].) This principle of "dual agency" is well established as a general principle of agency law. (See Rest.2d Agency, §§ 313, 391, 392.) In January of 1953, a Court of Appeal applied it for the first time to the insurance context. In *Maloney v. Rhode Island Ins. Co.* (1953) 115 Cal.App.2d 238 [251 P.2d 1027], it was held that a broker acting for the insured could also act as the agent of the insurer "[w]hen the broker accepts the policy from the insurer and the premium from the assured, he has elected to act for the insurer to deliver the policy and to collect the premium." (*Id.* at p. 244.)

Brokers liked the result in *Maloney* but did not want to be required to be licensed as agents as well as brokers. At their prompting, the Insurance Commissioner sponsored a bill that would codify the result of *Maloney* and authorize brokers to act as the insurer's agent while collecting premiums and delivering policies. (See Cal. Ins. Com., Enrolled Bill Rep. on Assem. Bill No. 1417 (1952 Reg. Sess.) prepared for Governor Warren (June 16, 1953).) The bill was signed into law in July 1953, six months after *Maloney* was decided. (Stats. 1953, ch. 1732, § 2, p. 3482 [enacting former § 1660.5].) The basis for what is now section 1732 provided: "A person licensed as an insurance broker may act as an insurance agent in collecting and transmitting premium or return[ing] premium funds and delivering policies and other documents evidencing insurance."

Here matters more or less remained until passage of Proposition 103 in 1988. That initiative made the Insurance Commissioner (Commissioner) an elected official (§ 12900), rolled back car insurance rates (§ 1861.01), and made rates subject to the Commissioner's approval (§ 1861.05). It also directed that every person who meets the statutory standards as a "good driver" (§ 1861.025) was entitled a rate "at least 20% below the rate the insured would otherwise have been charged for the same coverage." (§ 1861.02, subd. (b)(2).) "An insurer shall not refuse to offer and sell a Good Driver Discount policy to any person who meets the standards" (§ 1861.02, subd. (b)(1)).

In 1990 the Legislature added the term "broker-agent" to section 1625, which defines "fire and casualty licensee," and to section 1732. (Stats. 1990, ch. 1420, §§ 4, 57, pp. 6446, 6463.)[2] The same bill amended section 1704(a) to provide in pertinent part: "Every applicant for a license as a life agent, a

---

[2] These provisions now read: "A fire and casualty licensee is a person authorized to act as an insurance agent, broker, or solicitor, and a fire and casualty broker-agent license is a license so to act." (§ 1625.)

fire and casualty broker-agent to act as an insurance agent, or a travel insurance agent shall have filed on his or her behalf with the commissioner a notice of appointment to act as an agent executed by an insurer . . . appointing the applicant, upon licensing, its agent within this state" (Stats. 1990, ch. 1420, § 38, p. 6457).

Five years later "broker-agent" was added to the statute governing the termination of a broker or agent operating pursuant to a written contract. (§ 769, as amended by Stats. 1995, ch. 921, § 1, p. 7029.) Applicable to "a written agency or written brokerage contract[] where the broker-agent represents the insurer," the amended statute specified that advance notice of termination was not required if "the broker-agent [¶] . . . [¶] Exceeded his or her binding authority under the agency or brokerage contract." (§ 769, subds. (a), (b)(1).)

In January of 2000, the Commissioner sent Mercury a draft "Notice of Noncompliance." The gist of the notice was much the same as this litigation—that Mercury was employing brokers who "are operating as de facto agents" but who were being advertised by Mercury as independent. The notice was discussed at a meeting later that month between Mercury and representatives of the Department of Insurance. Mercury took the position that "statutes and court decisions do not clearly define the difference between agents and brokers." One of the Commissioner's representatives proposed that Mercury "draft a bill that defines agents and brokers" for submission to the Legislature. Mercury did so, but the Commissioner opposed the bill on the ground that it would " 'blur' the long-established legal distinctions between 'agents' and 'brokers' and would create confusion for the consumer . . . ." The Legislature passed the bill and the Governor signed it. It amended section 1623, which then provided: "An insurance broker is a person who, for compensation and on behalf of another person, transacts insurance other than life with, but not on behalf of, an insurer." The Mercury bill added the following language: "Every application for insurance submitted by an insurance broker to an insurer shall show that the person is acting as an insurance broker. If the application shows that the person is acting as an insurance broker and is licensed as an insurance broker in the state in which the application is submitted, it shall be presumed, for licensing purposes only, that the person is acting as an insurance broker. Nothing in this section is intended to affect any rights or remedies otherwise available under the law."[3] (Stats. 2000, ch. 1074, § 1.)

---

"A person licensed as a fire and casualty broker-agent acting as an insurance broker may act as an insurance agent in collecting and transmitting premium or return[ing] premium funds and delivering policies and other documents evidencing insurance." (§ 1732.)

[3] In Mercury's original version of the bill, the presumption was conclusive.

In 2000–2001, the Legislature enacted a number of statutes dealing with the scope of a "personal lines licensee." A person holding such a license is "authorized to transact automobile insurance, . . . including insurance for recreational vehicles used for noncommercial purposes, personal watercraft insurance, residential property insurance . . . including earthquake and flood insurance, inland marine insurance covering personal property, and umbrella or excess liability insurance providing coverage when written over one or more underlying automobile or residential property insurance policies . . . ." A personal lines "broker-agent" is given the same authorization. (§ 1625.5, subd. (a).) A fire and casualty licensee is defined as "a person authorized to act as an insurance agent, broker or solicitor, and a fire and casualty broker-agent" and "authorized to transact 24-hour care coverage . . . and any coverage that a personal lines licensee is authorized to transact" (§ 1625; see Stats. 2000, ch. 321, § 2; Stats. 2001, ch. 174, §§ 1–2).

Finally, in 2002, the Legislature again amended section 1704(a) to provide in pertinent part: "Life agents, travel agents, and fire and casualty insurance agents shall not act as an agent of an insurer unless the insurer has filed with the commissioner a notice of appointment, executed by the insurer, appointing the licensee as the insurer's agent" (Stats. 2002, ch. 203, § 15).

### (B)

This litigation commenced when plaintiff Robert Krumme filed a complaint "on Behalf of the General Public." Plaintiff stated he was challenging "the practices of the defendant insurance companies in selling automobile and other personal lines insurance policies through insurance producers[4] denominated as 'brokers' who in fact act as defendants' agents, but who nevertheless charge consumers 'brokers fees.' The broker fees are made part of—but are charged in addition to—the rates and premiums for defendants' products that were previously approved pursuant to Proposition 103 . . . . Defendants do not disclose the broker fees to the Department of Insurance, and the broker fees have not been reviewed or approved as required by law." The relief sought by plaintiff was "a judgment commanding restitution and disgorgement of monies and benefits taken illegally . . . and for injunctive relief to stop these business practices."

At the conclusion of a four-day bench trial, the trial court issued 17 pages of findings of fact and conclusions of law. Although Mercury states in its opening brief that many of the findings "are either unsupported by the

---

[4] "Producer" is not a statutory term, but appears to be a term of art in the insurance industry referring to persons or firms who "produce"—that is, generate or obtain—business for insurers. (See *Osborn v. Ozlin* (1940) 310 U.S. 53, 60–61 [84 L.Ed. 1074, 60 S.Ct. 758].) For our purposes, it means brokers and agents.

evidence or are otherwise flawed," it chooses to forgo challenging them because it sees issues of law—the trial court's erroneous conclusions of law in its application of statutes—as sufficient to require reversal of the injunction. In light of this approach, we presume the findings are supported by substantial evidence and summarize the relevant facts as set forth in the findings. (See *State Farm Mutual Automobile Ins. Co. v. Quackenbush* (1999) 77 Cal.App.4th 65, 72 [91 Cal.Rptr.2d 381].)

Until 1989, Mercury only sold insurance through approximately 800 appointed agents. Beginning in 1989, Mercury terminated the appointments of approximately 700 of those agents and made them brokers. In general, the change in title did not alter the ability or authority to bind Mercury, but it did allow the former agents to charge brokerage fees. Policies sold by brokers or appointed agents used the same application forms, rating guidelines, and underwriting guidelines, all of which were provided by Mercury. Both brokers and appointed agents advertise that they "represent" Mercury. Mercury subjects agents and brokers to the same amount of training and supervision. Mercury does not object to brokers charging brokerage fees (in addition to policy premiums), but it will discipline appointed agents who attempt to charge such fees. In its comparative rate advertising, Mercury does not advise that brokerage fees may be added to the advertised cost of insurance. This practice may provide a competitive advantage to Mercury, which "is aware of, and concerned about, misleading the public with its comparative rate print advertisements," but it "has not established any system to discover or monitor . . . and has no way of knowing" whether brokerage fees are being assessed. Mercury submits its insurance rates and premiums—but not the brokerage fees—to the California Department of Insurance for approval.

As conclusions of law, the trial court determined:

Brokers and appointed agents were "functionally indistinguishable" in their relationship to Mercury.

In view of the substance of their dealings with Mercury, "[b]ecause these 'brokers' have transacted, and do transact, insurance on behalf of Mercury, they cannot be considered 'insurance brokers' for licensing purposes within the meaning of Insurance Code § 1623 and are instead 'insurance agents' within the meaning of Insurance Code § 1621."

Mercury was incorrect in maintaining that its brokers could be both an agent and a broker, "the equivalent of a dual agent. Rather, dual agency . . . is permitted only in a very limited context, the authority to collect premiums and deliver policies. See Insurance Code § 1732 . . . . The purpose of this

safe harbor is to maintain the broker-agent distinction while at the same time protecting insureds. It is not a device to confuse the established legal distinction between a 'broker' and an 'agent' so clearly announced in § 1621 and § 1623 of the Insurance Code. Any other contention that the 'dual agency' notion is a tacit override of the restrictions legislatively created by § 1621 and § 1623 must be discounted in light of the clear mandate articulated in these legal standards. . . . From at least July 1, 1996 to date, the 'brokers' have transacted insurance on behalf of Mercury outside the limited scope permitted by Insurance Code section 1732."

"The Court construes Insurance Code § 1704(a) to require each insurance company who wishes to transact insurance in California to file Action Notices with the . . . Department of Insurance for all 'fire and casualty broker-agent' licensees who act in the capacity as an 'insurance agent' on the company's behalf within the meaning of Insurance Code section 1621. This construction is the most consistent with the language of Section 1704(a), and with the statute's purpose, which is to ensure that each such insurance company publicly identifies the broker-agent licensees acting on its behalf as a public acknowledgement of the company's liability for the errors and omissions of the licensee. By its operative language, § 1704(a) merges the role of 'broker-agent' only in the limited context of 'fire and casualty.' The Legislature expressly left untouched the broader statutory distinctions and regulatory effect of § 1621 and § 1623 in other forms of insurance policies when it amended § 1704(a)."

"From January 1, 1996 to date, Mercury has violated and continues to violate the letter, policy, and spirit of section 1704(a) by not filing Action Notices for 'brokers' selling Mercury personal lines auto insurance because the 'brokers' were and are acting in the capacity of insurance agents on Mercury's behalf within the meaning of Insurance Code section 11621."

The court further concluded that because broker fees may be charged only by bona fide brokers, not persons and firms claiming to be brokers that are in reality appointed agents, the brokerage fees collected by Mercury's "brokers" were illegal. "Mercury should have filed action notices for its 'brokers.' Its failure to do so violated and violates the spirit and policy of the common law of agency.

"Mercury is vicariously liable under the [UCL] for these past and ongoing violations of the broker fee regulations and the common law by its 'broker' agents. The 'brokers' charged and charge these 'broker fees' in the course and scope of transacting insurance on behalf of Mercury, and therefore in the capacity of insurance agents within the meaning of section 1621 on behalf of Mercury."

"From at least July 1, 1996, Mercury has engaged and continues to engage in false advertising in violation of Business & Professions Code sections 17200 and 17500 by advertising rate comparisons without disclosing that broker fees may be added in addition to the premium advertised. These advertisements were and are likely to deceive consumers because undisclosed broker fees that materially affect the cost of the insurance and adversely affect the comparison of Mercury's rates with those of the quoted competitors may be added at the time the consumer purchases Mercury insurance."

The court rejected Mercury's claim that "plaintiff's claims are subject to the exclusive jurisdiction of the State Department of Insurance . . . . None of plaintiff's claims challenges any rate or premium which Mercury submitted to or obtained approval from the State Department of Insurance or seeks to enforce any provision of Insurance Code section [1861.01] et seq. (Compare *Walker v. Allstate Indemnity Co.* (2000) 77 Cal.App.4th 750 [92 Cal.Rptr.2d 132].) Accordingly, exclusive jurisdiction is not a defense. . . . Indeed, *Walker* recognized the continuing application of the Unfair Competition Law as to insurers except in the area of ratemaking *Walker* at 77 Cal.App.4th 758–759. [¶] . . . [¶] A review of plaintiff's Third Amended Complaint discloses the allegations under § 17200 focus on the relationship Mercury producers have with the defendant. It alleges that the defendant has fostered this relationship without complying with § 1704 of the Insurance Code. As a result, Mercury is engaging in unfair, unlawful, and fraudulent business practices. The contentions found to be true by this Court, are not anchored in rates as opposed to relationships that generate the violation of Business and Professions Code § 17200."

"It is immaterial to Mercury's liability in this case that it did not actually receive the 'broker fees.' Under section 17200, the test of liability is whether Mercury engaged in unlawful, unfair or fraudulent business practices . . . . Mercury need not directly benefit in order to be held liable under this statute. Nevertheless, there is evidence in the record that even though Mercury did not directly receive the fees, Mercury perceives some business advantage and therefore a benefit in the charging of 'broker fees' by its 'broker' agents . . . . Further, Mercury is deemed by operation of law to have constructively received the 'broker fees.' . . . The issue of constructive as opposed to actual receipt is more appropriately addressed to the remedial aspect of the case."

The court thereafter entered a judgment in the form of a permanent injunction prohibiting Mercury from: (1) selling "any policy of personal lines automobile and/or homeowners insurance in California through a broker-agent who has not been appointed an agent" pursuant to section 1704(a) or "through a particular broker-agent [who Mercury knows] has charged or is continuing to charge a broker fee," and (2) publishing "any advertising

that compares insurance premiums for personal lines automobile and/or homeowner policies without a conspicuous statement . . . that a broker fee may be charged in addition to the premium quoted for the Mercury insurance." Thereafter the court granted plaintiff's motion for attorney fees pursuant to Code of Civil Procedure section 1021.5, and made an order awarding plaintiff $1,172,817.

Mercury filed timely notices of appeal from the judgment and from the fee order.

Both sides have the support of amici curiae on this appeal—the American Agents Alliance for Mercury, and the Commissioner for plaintiff.

## REVIEW

### I

Several semi-jurisdictional matters require initial comment.

Mercury makes a point of opening its brief with comments that plaintiff never purchased a policy from Mercury and is therefore utterly "disinterested" in the controversy he began. It is well established, however, that a personal stake is not required for standing to prosecute an unfair competition lawsuit on behalf of others: " '[A] private plaintiff who has himself suffered no injury at all may sue to obtain relief for others.' " (*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 561 [71 Cal.Rptr.2d 731, 950 P.2d 1086].)

According to Mercury, "the trial court's conclusion that Mercury 'constructively received' illegal broker fees, while incorrect, nonetheless brings this matter within the original and exclusive jurisdiction of the Insurance Commissioner and divests the superior court of any power to grant relief." Mercury reasons that if the fees charged by its brokers are part of the premium charged customers, the matter comes within the Commissioner's plenary authority over rates and premiums. We do not see the trial court's actions as trespassing upon the Commissioner's jurisdiction.

The elaborate statutory and administrative process for setting rates has "been interpreted to provide exclusive original jurisdiction over issues related to ratemaking to the commissioner." (*Walker v. Allstate Indemnity Co.*, *supra*, 77 Cal.App.4th 750, 755.) The Insurance Code does not, however, displace the UCL "except as to . . . activities related to rate setting." (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26,

33 [77 Cal.Rptr.2d 709, 960 P.2d 513]; see *Walker v. Allstate Indemnity Co.*, *supra*, at p. 759.) What a court held with respect to a federal statute forbidding local action that would "regulate . . . the rates charged" by a federally regulated industry is equally valid to the insurance context: "A judicial act constitutes rate regulation only if its principal purpose and direct effect are to control rates. . . . In general, a claim that directly challenges a rate and seeks a remedy to limit or control the rate prospectively or retrospectively is an attempt to regulate rates," but "a claim that directly challenges some other activity, *such as false advertising* . . . is not rate regulation." (*Spielholz v. Superior Court* (2001) 86 Cal.App.4th 1366, 1374–1375 [104 Cal.Rptr.2d 197], italics added.) A claim predicated on a violation of the Insurance Code not related to ratemaking may thus be framed as a claim under the UCL. (See *Donabedian v. Mercury Ins. Co.* (2004) 116 Cal.App.4th 968, 987 [11 Cal.Rptr.3d 45].) This was the approach plaintiff adopted. Mercury was allegedly violating provisions of the Insurance Code regulating brokers, as well as engaging in false advertising. There is consequently no basis for overturning the trial court's conclusion that "[n]one of plaintiff's claims challenges any rate or premium which Mercury submitted to or obtained approval from the . . . Department of Insurance."

Our confidence in this determination is enhanced by the fact that the Commissioner, appearing as amicus curiae, does not agree with Mercury, but has filed a brief supporting plaintiff. The fact that the Commissioner does not view the trial court as having poached into the Commissioner's statutory domain is clearly significant, and we defer to his interpretation of his authority. (E.g., *Henning v. Industrial Welfare Com.* (1988) 46 Cal.3d 1262, 1269 [252 Cal.Rptr. 278, 762 P.2d 442]; *Pacific Legal Foundation v. Unemployment Ins. Appeals Bd.* (1981) 29 Cal.3d 101, 111 [172 Cal.Rptr. 194, 624 P.2d 244]; *Personal Watercraft Coalition v. Marin County Bd. of Supervisors* (2002) 100 Cal.App.4th 129, 151 [122 Cal.Rptr.2d 425]; *Spanish Speaking Citizens' Foundation, Inc. v. Low* (2000) 85 Cal.App.4th 1179, 1214–1215 [103 Cal.Rptr.2d 75].)

After briefing was completed, Mercury sent a letter advising us of the recent decision in *Jonathan Neil & Assoc., Inc. v. Jones* (2004) 33 Cal.4th 917 [16 Cal.Rptr.3d 849, 94 P.3d 1055], wherein our Supreme Court discussed the doctrine of "primary jurisdiction." Mercury states in its letter that "This discussion is relevant to the present appeal because Mercury has argued, both in the trial court [and] in its appellate briefs, that this case should not have been adjudicated in the superior court, but should have been referred to the Insurance Commissioner." Plaintiff and Mercury then submitted letter briefs on this issue.

Unlike exclusive jurisdiction, primary jurisdiction is not jurisdictional in the sense that courts are utterly without the power to decide, but is a common

law policy advancing comity between courts and administrative agencies. " ' "Primary jurisdiction," . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views.' " (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 390 [6 Cal.Rptr.2d 487, 826 P.2d 730], italics omitted; see also *Common Cause v. Board of Supervisors* (1989) 49 Cal.3d 432, 441, fn. 6 [261 Cal.Rptr. 574, 777 P.2d 610].) "[T]he primary jurisdiction doctrine advances two related policies: it enhances court decisionmaking and efficiency by allowing courts to take advantage of administrative expertise, and it helps assure uniform application of regulatory laws. [Citations.] [¶] No rigid formula exists for applying the primary jurisdiction doctrine [citation]. Instead, resolution generally hinges on a court's determination of the extent to which the policies noted above are implicated in a given case. [Citations.] This discretionary approach leaves courts with considerable flexibility to avoid application of the doctrine in appropriate situations, as required by the interests of justice." (*Farmers Ins. Exchange v. Superior Court, supra*, at pp. 391–392, fns. omitted.)

Mercury invoked the doctrine of primary jurisdiction before the trial court. Mercury did not, however, claim in its opening brief that the trial court's decision not to stay judicial proceedings was an abuse of discretion. Mercury did not mention the issue of the Commissioner having primary jurisdiction until it filed its reply brief. Thus, the issue could be treated as waived. (E.g., *Kahn v. Wilson* (1898) 120 Cal. 643, 644 [53 P. 24]; *Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764 [60 Cal.Rptr.2d 770]; 9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 616, pp. 647–648.)

Assuming the issue was preserved, we conclude the trial court did not abuse its discretion by declining to refer the matter to the Commissioner. First, there is a basis for believing the Commissioner would not have accepted the referral. In July of 2000, when he adopted regulations concerning broker fees (see Cal. Code Regs., tit. 10, §§ 2189.1–2189.8), the Commissioner took the position that "current California case law establishes that the existence of binding authority creates an agency relationship between insurer and producer. *Marsh & McLennan of California v. City of Los Angeles*[, *supra*,] 62 Cal.App.3d 108 [132 Cal.Rptr. 796]. . . . *The issue of what factors, such as binding authority, do or do not establish an agency relationship are better addressed by* the legislature and *the courts*. The Commissioner arguably lacks a legislative delegation to resolve this issue through regulations." (Ins. Com., Final Statement of Reasons, Cal. Code Regs. tit. 10, § 2189.1 et seq., File No. RH-379 (July 6, 2000), pp. 19–20, italics added.) Second, as plaintiff's attorney stated in his letter responding to Mercury's letter: "[T]he

Commissioner . . . has now made his views known to the courts through his amicus curiae brief, stating that he agrees with the findings and conclusions of the Superior Court, with one minor immaterial exception. The amicus curiae brief establishes that even if Mercury had sought a stay based on primary jurisdiction, which of course it did not, there was no error or prejudice to Mercury from the Superior Court's not having the views of the Department of Insurance before its decision on the merits." Again, the Commissioner's silence is eloquent evidence of his belief that he had no administrative expertise to offer the court in resolving the issues generated by this litigation. (*Personal Watercraft Coalition v. Marin County Bd. of Supervisors, supra,* 100 Cal.App.4th 129, 151; *Spanish Speaking Citizens' Foundation, Inc. v. Low, supra,* 85 Cal.App.4th 1179, 1214–1215.) For each and all of these reasons, the Commissioner's primary jurisdiction was not an impediment to the trial court proceeding to adjudicate the issues before it.

## II

Mercury's principal contention is that "the dual agency practiced by Mercury and its independent brokers cannot form the basis of UCL liability because it falls within a statutory and regulatory safe harbor." Mercury is invoking an exception to the UCL that our Supreme Court explained as follows: "Although the unfair competition law's scope is sweeping, it is not unlimited. Courts may not simply impose their own notions of the day as to what is fair or unfair. Specific legislation may limit the judiciary's power to declare conduct unfair. If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 182 [83 Cal.Rptr.2d 548, 973 P.2d 527].) However, the court added a caution: "Acts that the Legislature has determined to be lawful may not form the basis for an action under the unfair competition law, but acts may, if otherwise unfair, be challenged under the unfair competition law even if the Legislature failed to proscribe them in some other provision." (*Id.* at p. 183.)

Mercury marshals a number of arguments as to why its practices with brokers are proper and should not have been enjoined.

"Proposition 103 altered the way insurance products were delivered to consumers. With all underwriting decisions made in advance under the watchful eyes of the Insurance Commissioner, personal lines insurance became more of a 'commodity,' and the functions of the insurance producer became limited primarily to customer service. If an applicant is a 'good

driver,' satisfies the insurer's guidelines, and pays the initial premium, the insurer must automatically accept the risk. The generic nature of this transaction reduced the significance of any distinction between the functions of agents and brokers. [¶] Due to mandatory insurance laws . . . the marketplace also demanded that all insurance producers have the ability to provide immediate 'on-the-spot' insurance coverage to every qualified applicant. Without that ability, producers could not satisfy the needs of car purchasers unable to drive their cars off the lot without insurance. The realities of the changed market are reflected in the post-Proposition 103 amendments to the Insurance Code provisions relating to brokers and agents, which progressively vested brokers with all authority traditionally associated with agents. To the extent that the definitional provisions of the Insurance Code had operational significance, before that significance was eliminated." Mercury points to the 1990 amendments to sections 1625 and 1732 (see fn. 2 and accompanying text, *ante*) as having "drained the definitional language of Sections 1621 and 1623 of their operating significance and further codified the dual agency doctrine, reflecting legislative recognition, in the wake of Proposition 103, that brokers were simultaneously performing agency functions beyond those heretofore specifically listed in Insurance Code section 1732 . . . incorporating the broker-agent licensee into its statement of dual agency." Mercury concludes that "the codification of dual agency in Section 1732, together with the broker's authority to 'transact' insurance conferred by Section 1625 & Section 1625.5, creates an express safe harbor for Mercury's practices that precludes UCL liability."[5]

Plaintiff responds that section 1704(a) "should not be accorded the toothless interpretation that insurance companies may simply forego appointment with impunity," but should be construed to impose an affirmative duty on insurers to file appointment notices for any licensee acting as an insurer's agent. Plaintiff urges us to adopt this bright-line test—"if the licensee acts as an agent for the insurer *in any capacity*, except as expressly allowed by

---

[5] Mercury includes in its discussion the regulations on "broker fees" promulgated by the Commissioner in 1998 (Cal. Code Regs., tit. 10, §§ 2189.1–2189.8) and two advisory letters written by a staff attorney in the Department of Insurance. These materials are not germane to our analysis because our Supreme Court has held that only statutes can create a safe harbor. (See *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, supra, 20 Cal.4th 163, 182–184.)

Mercury also argues that its "marketing practices fall within an implied safe harbor because the overall statutory scheme acknowledges the existence of the broker market as currently structured." However, a safe harbor statute must explicitly prohibit liability for the defendant's acts or omissions. (See *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, supra, 20 Cal.4th at p. 184 ["the unfair competition law does not permit an action that another statute expressly precludes. [¶] . . . [A] plaintiff may not bring an action under the unfair competition law if some other provision bars it. That other provision must actually bar it, however, and not merely fail to allow it."].) Mercury's argument that it should be protected by an implied safe harbor is contrary to the approach adopted by our Supreme Court.

section 1732, the licensee is an agent and must be appointed." The Commissioner takes essentially the same view: "[I]f a producer acts on behalf of an insurer *in any way* (except as permitted by section 1732 . . .), then he or she ceases to be a broker, even if the producer mainly acts for the insured." The "plain meaning of sections 1621 and 1623" is that "a producer is an agent if the producer acts on behalf of an insurer in any way not permitted by section 1732." If this argument does not succeed, plaintiff's alternative position is that the judgment may be affirmed because the trial court's findings of fact support the conclusion that the brokers were Mercury's de facto agents and therefore subject to the appointment requirement of section 1704(a).

Neither of these arguments is completely persuasive, in large part because each suffers from a common defect. Each selectively emphasizes favorable statutory language in isolation without attempting to fit the language into a coherent reading of all of the statutes in the Insurance Code dealing with the agent-broker issue. Mercury depicts a remorseless march of history away from mutually exclusive concepts of agent and broker, but does not account for the Legislature's refusal to stop using these terms in new statutes. Plaintiff fears that if Mercury prevails, section 1704(a) will become a dead letter because no insurer will bother to appoint agents, but deal only with brokers for whom the insurer will not be vicariously liable. As a court, however, "we do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' " (*People v. Pieters* (1991) 52 Cal.3d 894, 899 [276 Cal.Rptr. 918, 802 P.2d 420].)

■ Mercury does not establish, as a matter of law that the Legislature expressly created a safe harbor for the practices enjoined by the trial court. True, the Legislature did, following *Maloney*, enact what is now section 1732 to codify acceptance of the concept of dual agency in the insurance field, and in that sense did create an express statutory safe harbor. It did so, however, in a very precise way, going no further than the *Maloney* court—a broker could act as an insurer's agent, but only to the extent of "collecting and transmitting premium or return[ing] premium funds and delivering policies and other documents evidencing insurance." Despite numerous opportunities to do so, the Legislature has never expanded this definition in section 1732.

The 1990 addition of "broker-agent" to section 1625 defining fire and casualty licensee, and to section 1732 broker (see fn. 2, *ante*) does not, at first glance, assist Mercury because neither of these changes suggests that by adding the new term the Legislature intended to make any fundamental alteration of the established distinction between agent and broker. Indeed, the amendment of section 1732 in the same bill would seem to have been premised on maintaining that distinction by addressing the situation where

"[a] person licensed as a fire and casualty broker-agent [who is] *acting as an insurance broker* may act as an insurance agent in collecting and transmitting premium or return[ing] premium funds and delivering policies and other documents evidencing insurance." (Italics added.) If, as Mercury argues, the Legislature intended to "drain[] the definitional language of Sections 1621 and 1623 of their operating significance," this would have been a very oblique way of achieving that goal; a far more logical approach would have been to have amended or repealed the statutes defining agent and broker. (Cf. *Elbert, Ltd. v. Gross* (1953) 41 Cal.2d 322, 330 [260 P.2d 35] ["Had the Legislature intended to create an exception to the statute of limitations, the more logical place to do so would have been in section 75, rather than in section 74, of the act."].)

The legislative history establishes that the Legislature did indeed intend to amalgamate the categories of broker and agent, at least with respect to personal lines. The Legislative Counsel's digest for the bill states: "This bill would eliminate insurance agent and insurance broker as categories of licensure, and would instead provide for licensure of fire and casualty insurance broker-agents. . . . Under the bill, fire and casualty broker-agents could be authorized to act as brokers or agents." (Legis. Counsel's Dig., Sen. Bill No. 2642 (1989–1990 Reg. Sess.) 5 Stats. 1990, Summary Dig., p. 565.) There are numerous committee reports and analyses that made the same point. (Sen. Com. on Insurance, Claims and Corporations, Rep. on Sen. Bill No. 2642 (1989–1990 Reg. Sess.) as amended Apr. 4, 1990, p. 1 ["SB 2642 does the following: [¶] 1) Combines existing licenses: [¶] a. Property and casualty sales licenses (solicitor, agent & broker) into a broker-agent license"]; Sen. Rules Com., Rep. on Sen. Bill No. 2642 (1989–1990 Reg. Sess.) as amended May 17, 1990, p. 2 [bill would combine "Property and casualty sales licenses (solicitor, agent and broker) into a broker-agent license"]; Assem. Com. on Finance and Insurance, Analysis of Sen. Bill No. 2642 (1998–1990 Reg. Sess.) July 3, 1990, p. 1 ["This bill . . . combines the property casualty licenses into a single license, called the fire and casualty broker/agent license"]; Assem. Com. on Ways and Means, Analysis of Sen. Bill No. 2642 (1998–1990 Reg. Sess.) Aug. 9, 1990, p. 1 ["This bill . . . makes several changes related to the licensure categories, including combining agent and broker license categories"].)

Thus, there is some basis for Mercury to maintain that the changes enacted by the 1990 bill "drained the definitional language of Sections 1621 and 1623 of their operating significance and further codified the dual agency doctrine," but only as to personal lines handled by a fire and casualty broker-agent. Of greater consequence is the fact that the same bill that inserted "broker-agent" into sections 1625 and 1732 also amended section 1704(a) to read in pertinent part: "Every applicant for a license as a . . . fire and casualty broker-agent to act as an insurance agent . . . shall have filed on his or her

behalf with the commissioner a notice of appointment to act as an agent executed by an insurer, . . . appointing the applicant . . . its agent within this state." (Stats. 1990, ch. 1420, § 38, p. 6457.) Further statutory recognition is found in the subsequent changes to section 769 addressing the grounds for terminating the written contract of a broker-agent with an insurer, and the addition of section 1625.5 authorizing a personal lines agent to become a fire and casualty broker-agent. Each of these statutes must be considered in light of the others, and harmonized with them.[6]

For Mercury, the Legislature, by introducing the term "broker-agent" into a number of statutes (principally sections 769, 1625, and 1625.5), and yet not defining that term, means that the only definition can come from the statutes defining "broker" and "agent." According to this reasoning, broker-agents can now exercise the powers of brokers and agents that are spelled out in sections 1623 and 1621, respectively, without being subjected to the limitations laid out in those same statutes. If this approach were to be accepted, personal lines broker-agents would in effect be free to exercise all of the powers authorized by those statutes. The limitations imposed by sections 1621 and 1623 would in essence be cancelled and, as applied to personal lines broker-agents, the statutes would become dead letters. We are not persuaded.

Section 1704(a) was the linchpin of the trial court's decision. The 1990 version clearly stated that an "applicant for a license as . . . a fire and casualty broker-agent to act as an insurance agent" must be appointed. The 2002 version, however, changed "fire and casualty broker-agent" to "fire and casualty insurance agents." Upon examination, however, both versions of section 1704(a) support the judgment entered by the trial court.

The first version was enacted by the same bill whereby the Legislature added the term "broker-agent" to sections 1625 and 1732, the same bill Mercury maintains homogenized the former categories of broker and agent into the new single category of broker-agent. This was only one year after Mercury began converting its agents to brokers. Thus, for more than a decade Mercury was not complying with the plain command of section 1704(a) as it then read, that "[e]very applicant for a license . . . as a fire and casualty broker-agent to act as an insurance agent" *shall* be appointed.

---

[6] "It is . . . 'an established rule of statutory construction that similar statutes should be construed in light of one another . . . . "[A]pplication of the rule that statutes in pari materia should be construed together is most justified, and light from that source has the greatest probative force, in the case of statutes relating to the same subject matter that were passed at the same session of the legislature, especially if they were passed or approved or take effect on the same day . . . ." ' [Citation.] When as in the present case both statutes are part of the same bill, enacted and chaptered together, the rule requiring the courts to reconcile the statutes is even more compelling . . . ." (*International Business Machines v. State Bd. of Equalization* (1980) 26 Cal.3d 923, 932 [163 Cal.Rptr. 782, 609 P.2d 1].)

■ The 2002 amendment changed the reference from "broker-agent" to "agent." The legislative history provides no clear reason why this particular change was made. The history demonstrates that the major intention of the bill, which amended, repealed, and added numerous provisions to the Insurance Code, was to avoid federal regulation in the areas of federally chartered depository institutions and reciprocal multistate licensing of producers; there is nothing showing why this precise change was made, and no expressed intent to relieving personal lines broker-agents of the appointment requirement.[7] Because the legislative history is completely silent, there is no reasonable basis for concluding that the Legislature intended that people writing fire and casualty insurance on behalf of insurers, whether called broker-agents or agents, should be exempt from the appointment requirement. (See *People v. Barker* (2004) 34 Cal.4th 345, 356 [18 Cal.Rptr.3d 260].) Certainly, there is no basis for believing that Mercury was anticipating this change, or relying upon it, when it began converting its appointed agents to brokers in 1989.

To be sure, Mercury has presented a convincing argument that the traditional distinction between broker and agent has receded. But it does not follow that broker-agents are exempt from the appointment requirement of section 1704(a). Reading all the statutes together and in light of each other (see *International Business Machines v. State Bd. of Equalization, supra,* 26 Cal.3d 923, 932, quoted at fn. 6, *ante*) it appears that in this area the terms have become interchangeable. Brokers can exercise the traditional functions of agents, and vice versa. Having already enacted in the 1990 version of

---

[7] The Legislature stated its reasons for enacting the bill in these findings: "(a) Pursuant to the federal government's Financial Services Modernization Act of 1999 (the Gramm-Leach-Bliley Act), the Comptroller of the Currency, the Office of Thrift Supervision, the Federal Deposit Insurance Corporation, and the Board of Governors of the Federal Reserve Bank adopted joint consumer protection regulations. In order for California to retain jurisdiction to regulate the insurance sales practices of depository institutions, or persons who are engaged in those activities at an office of a depository institution or on behalf of a depository institution, California law must have similar or stronger consumer protections than those of the four federal agencies. Consequently, it is necessary to add language to the Insurance Code to provide California with consumer protection laws that are uniform with the federal regulations.
"(b) The Gramm-Leach-Bliley Act authorizes the establishment of a new organization named the National Association of Registered Agents and Brokers (NARAB). NARAB comes into existence if 29 state and territory insurance regulators do not implement uniform or reciprocal laws for the licensing of nonresident insurance producers by November 2002. NARAB would establish uniform producer licensing laws and provide a mechanism for multistate licensing of insurance producers, thereby preempting state-unique licensing procedures and qualifications. In an effort to avoid the creation of NARAB and preserve state regulation of producer licensing, California should amend the Insurance Code as necessary to create reciprocal licensing laws." (Stats. 2002, ch. 203, § 1.) A number of legislative committee reports and analyses never discuss precisely why the amendment of section 1704(a) was related to either the practices of federally chartered depository institutions or creating reciprocal licensing laws.

section 1704(a) that every "broker-agent" must be appointed, and there being no indication that the Legislature meant to relax this requirement, the 2002 amendment of section 1704(a) can be read as simply a reformulation of the appointment requirement. What had been explicit in the 1990 version was now implicit; "agent" was now used as shorthand for "broker-agent." Another provision of section 1704 demonstrates this point.

■ The 2002 version did not amend that portion of section 1704(a) which provides that a notice of appointment will remain valid until "[t]he filing of a notice of termination by the insurer . . . or by the appointed . . . fire and casualty broker-agent . . . ." (§ 1704, subd. (a)(2).) If the Commissioner must be notified that a broker-agent's appointment for an insurer is terminated, it logically follows that the Commissioner must be notified when the broker-agent is first appointed by an insurer, and—as noted by the trial court—by which insurer. There would be no point to the Legislature not requiring broker-agents to be appointed, but then in the same statute specifying the circumstances when that nonexistent appointment would end. Statutorily, "broker-agent" is therefore the same as "agent" for purposes of section 1704(a).

Notwithstanding the 2002 change to section 1704(a), there are a number of other statutes showing that a fire and casualty broker-agent is still treated as an agent and is therefore subject to the appointment requirement. For example, a broker-agent can be an insurer's "general agent" who, pursuant to a written contract "has the power to (1) appoint, supervise, and terminate local agents, (2) accept or decline risks, and (3) collect premium money from producing broker-agents." (§ 769.55.) "[A]n insurer may own or control, whether directly or indirectly, a separate entity licensed . . . as a fire and casualty broker-agent . . . . Insurance transacted by a fire and casualty broker-agent with and on behalf of the owning or controlling insurer shall be in its capacity as an insurance agent." (§ 1649.5.) The same is true if the broker-agent is the insurer's managing general agent. (§ 1735.) None of these statutes expressly indicate these are agents who are exempt from the appointment requirement.

■ Mercury and amicus curiae American Agents Alliance have devoted considerable time and attention to explaining the numerous and valuable services broker-agents can and do provide in securing automobile insurance for the public. This may be conceded, but it is not relevant. What is relevant is what the statutes say and whether what they say establishes a safe harbor protecting Mercury from UCL liability. Until the Legislature makes an express statutory declaration to the contrary, we cannot hold that Mercury enjoys a safe harbor from the requirement that its broker-agents must be appointed in accordance with section 1704(a). (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co, supra*, 20 Cal.4th 163, 182–184.)

## III

■ Mercury next contends that its advertising "likewise falls within a safe harbor that precludes UCL liability." It bases this claim upon the broker's fees regulations promulgated by the Commissioner in 1998. As has already been established, administrative regulations are insufficient to create a safe harbor from UCL liability. (See fn. 5, *ante.*) Mercury argues "there is little or no precedent" for making Mercury vicariously responsible for charges added by "third party" broker-agents to the premiums charged by Mercury. This overlooks the extensive findings made by the trial court— findings which Mercury does not challenge—detailing the relationship between Mercury and its ostensible "brokers." Mercury "has cultivated stable, long-term relationships with its 'brokers,'" none of whom objected when Mercury "converted" them from appointed agents to brokers. The broker contracts recite that the broker will "represent" Mercury, which "knowingly permits . . . 'brokers' to advertise to the public that they 'represent' Mercury." Advertising by brokers is approved by Mercury, which allows brokers to use Mercury's name and logo. Mercury sends "representatives who periodically visit, monitor and supervise . . . brokers on behalf of Mercury" to ensure "compliance with Mercury's rules and regulations, the professionalism of their agencies, and their compliance with law." Mercury lists the brokers on its Internet Web site, allows them to participate in Mercury's direct mail campaigns, and is aware that the comparison rate advertising it directs may be misleading in that customers are not told that brokers fees will be added. In light of all these findings, the trial court also found that "Mercury has exercised and exercises substantial control over its independent producers . . . in structuring and administering its relationships with them." These undisputed findings are sufficient to establish that the brokers are the ostensible agents of Mercury (Civ. Code, §§ 2298, 2300, 2315, 2317) and Mercury is therefore vicariously responsible for them. (Civ. Code, § 2338; *Flippo Industries, Inc. v. Sun Ins. Co.* (1999) 74 Cal.App.4th 1429, 1442 [88 Cal.Rptr.2d 881]; *Alhino v. Starr* (1980) 112 Cal.App.3d 158, 174 [169 Cal.Rptr. 136].)

The trial court concluded from the findings that injunctive relief was required to halt Mercury's "ongoing violations," including its "false advertising." Its decision to issue the permanent injunction to halt these practices will be overturned only if we are compelled to conclude that the remedy amounts to an abuse of discretion. (E.g., *Union Interchange, Inc. v. Savage* (1959) 52 Cal.2d 601, 606 [342 P.2d 249]; *Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912 [117 Cal.Rptr.2d 631].) We find no abuse.

## IV

In their application for attorney fees, plaintiff's attorneys submitted that $781,878 was a fair lodestar figure for the reasonable value of their services,

and should be increased by a multiplier of two. The court found that the lodestar fees were reasonable and should be increased by a multiplier of 1.5, for an award of $1,172,817.

Employing less than two pages in its brief, Mercury's final argument is that this award "should be vacated, reduced or remanded." Mercury submits that because plaintiff began by seeking restitution but ended up with only injunctive relief that is "technical in nature and confers virtually no benefits on consumers. Without a restitution award, this case should be considered a failure for Plaintiff's attorneys. . . . [¶] . . . Based on the results of this litigation, if any multiplier should have been applied to Plaintiff's lodestar, it should have been reduced rather than increased. A positive multiplier is not supported by the evidence, considering the lack of Plaintiff's success in accomplishing the primary objective of the lawsuit."

It is true that plaintiff originally sought restitution and did so up to the entry of judgment. The court rejected the plaintiff's proposal "to take discovery for a period of three months from the Mercury brokers to discover which ones have charged broker fees and to scale this problem into a factual context rather than dealing with it as it is now where we don't really know what's involved administratively or managerially with the mechanics of restitution." Nevertheless, plaintiff did achieve a significant objective of the lawsuit—halting Mercury's placing of insurance through brokers who were not appointed agents.

"There is no hard-and-fast rule limiting the factors that may justify an exercise of judicial discretion to increase or decrease a lodestar calculation." (*Thayer v. Wells Fargo Bank* (2001) 92 Cal.App.4th 819, 834 [112 Cal.Rptr.2d 284].) There are numerous such factors, and their evaluation is entrusted to a trial court's sound discretion; any one of those factors may be responsible for enhancing or reducing the lodestar. (E.g., *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132, 1134, 1138 [104 Cal.Rptr.2d 377, 17 P.3d 735]; see also *Moran v. Oso Valley Greenbelt Assn.* (2001) 92 Cal.App.4th 156, 161 [111 Cal.Rptr.2d 636].) Mercury, however, is seeking to elevate one factor above all others. Mercury makes no attempt to challenge the trial court's findings that the litigation initiated by plaintiff "enforced an important right affecting the public interest" and "conferred a significant benefit upon . . . a large class of persons." Nor does it contest other findings that the hours claimed were reasonable, as were the hourly rates charged by plaintiff's attorneys. The trial court may have taken account of plaintiff's incomplete success when it reduced the multiplier requested by plaintiff; such an approach was court approved by this court in *Beasley v. Wells Fargo Bank* (1991) 235 Cal.App.3d 1407, 1418–1419 [1 Cal.Rptr.2d 459], a decision that was repeatedly cited by plaintiff in its fee application. Accordingly, Mercury

has not demonstrated that the trial court abused its discretion in fixing the amount of plaintiff's award.

## DISPOSITION

The judgment and the attorney fee order are affirmed.

Reardon, J., and Rivera, J., concurred.

A petition for a rehearing was denied November 29, 2004, and appellants' petition for review by the Supreme Court was denied January 19, 2005.