Filed 8/29/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| BETTY DOUGLAS et al.,<br><br>        Plaintiffs and Appellants,<br>v.<br><br>FIDELITY NATIONAL INSURANCE CO.,<br><br>        Defendant and Appellant. | A137645<br><br>(Alameda County<br>Super. Ct. No. RG11591967) |
| BETTY DOUGLAS et al.,<br><br>        Plaintiffs and Respondents,<br>v.<br><br>FIDELITY NATIONAL INSURANCE CO.,<br><br>        Defendant and Appellant. | A137732 & A137897<br><br>(Alameda County<br>Super. Ct. No. RG11591967) |

In this insurance bad faith case, plaintiffs Betty and Jerry Douglas and defendant Fidelity National Insurance Company (Fidelity) appeal from the judgment after jury trial. Judgment was entered in favor of plaintiffs and against Fidelity in the amount of $807,058.10, plus interest and costs of suit. Plaintiffs appeal the trial court's decision to strike the jury's $1.9 million punitive damages award following the granting, in part, of Fidelity's motion for judgment notwithstanding the verdict (JNOV) (appeal no. A137645). Fidelity appeals from the same order arguing, among other things, that the court committed jury instructional error (appeal no. A137732). Fidelity also filed a notice of appeal from the court's ruling on the motion to tax costs (appeal no. A137897).[1]

---

[1] On April 12, 2013, the parties filed a stipulation to consolidate the three appeals.

1

We agree with Fidelity that the trial court prejudicially erred in refusing to give certain jury instructions necessary to the jury's fair consideration of the case. Accordingly, the judgment is reversed and the matter is remanded for a new trial.[2]

## FACTUAL BACKGROUND

In December 2010, plaintiffs went to a business called Cost-U-Less Insurance (Cost-U-Less) where, over the telephone, an InsZone Insurance Services (InsZone) employee assisted them in obtaining a homeowner's insurance policy with Fidelity.

On March 14, 2011, a fire damaged plaintiffs' home. Shortly thereafter, they made a claim with Fidelity to recover for their losses.

On May 6, 2011, a Fidelity property claims representative named Richard Fowler sent Jerry a letter advising him that Fidelity was investigating coverage for the fire incident.[3] Fowler indicated Fidelity had obtained information suggesting Jerry did not live in the home. Additionally, Fowler stated the company's belief that the property had been used and operated as a residential care facility.

After an investigation, Fidelity rescinded the homeowner's policy on the grounds that plaintiffs' insurance application contained material misrepresentations about various facts concerning plaintiffs' and their home. Fidelity stated it would not have issued the policy had it known the truth about the misrepresentations.

## PROCEDURAL HISTORY

### I. Litigation Commences

On August 24, 2011, plaintiffs filed a complaint against Fidelity and InsZone. The complaint alleges causes of action for breach of contract, declaratory relief, breach of the

---

[2] Plaintiffs' motion to strike Fidelity's appendices and for sanctions is denied. While the record submitted by Fidelity is quite large, under the circumstances of this case we are not inclined to penalize thoroughness. We also deny plaintiffs' motion to strike a portion of Fidelity's reply brief.

[3] We refer to Betty and Jerry Douglas collectively as plaintiffs, and individually by their first names for the sake of clarity.

2

covenant of good faith and fair dealing, negligent misrepresentation, and breach of an oral contract to obtain insurance.[4] The gravamen of the complaint is that Fidelity wrongfully failed to pay benefits due under plaintiffs' homeowner's insurance policy after the home was damaged in a fire. Plaintiffs sought punitive and exemplary damages in connection with their claim for breach of the covenant of good faith and fair dealing.

On September 26, 2011, Fidelity filed a motion to strike the claim for punitive damages. Fidelity asserted the complaint failed to allege sufficient facts to support the conclusion that it had acted with oppression, fraud, or malice.

On December 9, 2011, the trial court denied Fidelity's motion to strike.

On December 19, 2011, Fidelity filed a cross-complaint against plaintiffs for declaratory relief, restitution, and reimbursement. Fidelity asserted it was entitled to restitution of all benefits paid under the policy prior to the rescission.

On June 21, 2012, Fidelity filed a motion for summary judgment.

On September 11, 2012, the trial court denied Fidelity's motion for summary judgment.

## II. Proceedings at Trial

### A. Plaintiffs' Case

#### 1. Jerry Douglas

Jerry testified he had been married to Betty for 23 years. The couple has five children, some of whom are adopted. They purchased a home on Locust Street in Hayward in 1993 or 1994. Jerry was listed on the deed as the owner of the home but he considered the residence to be community property. The family moved to Stockton in 2005. They kept the Hayward house and used it to run a group home for minors on probation.

---

[4] Plaintiffs subsequently dismissed their causes of action for negligent misrepresentation and breach of oral contract against Fidelity.

Around 2008 and 2009, the family experienced serious financial difficulties. Jerry lost his job and Betty was having health problems. They ceased operating the group home and moved back to the Locust Street property in March 2010. They also filed for bankruptcy and became late on their mortgage payments.[5]

In December 2010, plaintiffs went to a Cost-U-Less store in Stockton to purchase an insurance policy for the Locust Street home. Previously, Betty had gone by herself to a Cost-U-Less store in Hayward and had obtained a Fidelity policy. However, the policy was cancelled shortly thereafter. Jerry understood the policy had been cancelled because the owner of record was required to sign the application.

When plaintiffs arrived at the Stockton store, an employee told them the paperwork he needed had not yet arrived. They left the store and did some shopping nearby. When they returned, the employee told them he had received the documents and only needed Jerry's signature. The insurance paperwork Jerry signed consisted of three pages. The first page was a blank form. The employee at Cost-U-Less did not ask him any questions about the property. Jerry signed the documents and gave the employee a check.

After the fire occurred, plaintiffs met with an inspector named Lon Anderson who looked over the home and made an inventory of the damage. Someone had broken into storage sheds on the property and stolen Jerry's tools. Jerry estimated the value of the tools to be about $25,000 to $30,000. Anderson told him he could make a separate claim for the stolen items.

Jerry received a letter dated May 31, 2011 from an attorney named Jeffrey Charlston. The letter included a check from Fidelity in the amount of the insurance premium Jerry had paid. Charlston stated that in the course of investigating the fire loss,

---

[5] The Locust Street property eventually went into foreclosure and was sold in March 2012.

evidence had developed showing material misrepresentations had been made in connection with plaintiffs' insurance application.[6] The alleged misrepresentations pertained to: (1) whether any unit in the structure was occupied by more than one family, (2) whether the electrical panel utilized circuit breakers or fuses,[7] (3) whether there were roommates or boarders in the home and/or if the home was used as a rooming or boarding house, and (4) whether a business was conducted on the property. Charlston also stated it did not appear Jerry had ever personally lived in the home, asserting the property was being used either as a halfway house for parolees or as a rehab facility. Jerry testified that these claims were untrue. Finally, Charlston advised that plaintiffs owed Fidelity in excess of $24,000 for benefits already paid.

On cross-examination, Jerry confirmed plaintiffs had filed for bankruptcy approximately three days before the fire. However, the signatures on the bankruptcy documents were not his. He did not recall if he had given his wife permission to sign his name. Plaintiffs had also filed bankruptcy petitions in October 2010 and March 2010. These filings also had signatures that were not his. Many of the statements regarding the family's assets in the supporting documentation for the October 2010 bankruptcy filing were false. One of the documents stated Jerry had worked as an "ARF counselor" with "On The Right Path" for 11 years.[8]

### 2. Lon Anderson

Lon Anderson is an independent insurance adjustor. He was assigned to make contact with plaintiffs, inspect the damaged home, take photographs, and complete a preliminary report. During the investigation, he spoke with Fowler, Fidelity's

---

[6] On cross-examination, Jerry admitted he had previously received the letter from Fidelity dated May 6, 2011. He did not contact Fidelity in response to that letter.

[7] At trial, Jerry admitted there was a panel of fuses in the garage.

[8] It appears "ARF" stands for "adult residential facility."

representative. Anderson went to the property twice and took photographs. He also obtained a non-waiver agreement from plaintiffs, as well as authorization forms.[9]

Anderson did not recall meeting with Jerry or discussing any missing tools, though he may have spoke with him on the telephone. Subsequent test results showed the house was contaminated with asbestos and lead. In his final report, he estimated the cost of repair for the damage to the structure to be $242,572.70.[10] He estimated the actual cash value at $225,468.18.

### 3. Betty Douglas

#### a. The Locust Street Property

Betty testified that she ran a daycare business out of the Hayward home for about 10 years. The family lived in the home until 2005 when she decided to stop the daycare business and instead use the house as a group home. The group home was called "Leading the Right Path." It housed minors who had been removed from their parents' care and who were on juvenile probation. Under state regulations the home could not also be used as a personal residence, so plaintiffs bought a house in Stockton and moved there. Betty operated Leading the Right Path until about 2008. About a year later, plaintiffs decided to move back to the Hayward home.

In 2007, Betty submitted an application to a licensing agency for another business called "On the Right Path," intending to provide housing for clients with developmental disabilities.[11] She successfully obtained the license but never served a developmentally disabled client. She kept the license active, however, so her home remained a licensed adult facility. The license allowed her to house up to six clients at a time.

---

[9] A non-waiver is a written agreement signed by the insured stating they understand that the claim procedures are not an admission of liability under the policy.

[10] Dan Duculescu testified as plaintiffs' expert witness. He is employed by a general contractor that repairs and restores homes after fires. He estimated the total repair cost at $298,857.98.

[11] The license for On the Right Path became effective on February 20, 2008.

Although the corporation called On the Right Path went out of business, Betty testified that "On the Right Path, dba" did serve some mentally ill clients. The clients were sometimes referred to her by psychiatric hospitals and transitional living programs. She received between $600 to $961 per month from each such client. The clients paid with their SSI checks. She usually rented out one bedroom for two clients to share. She also cooked meals for them. If she had more than two clients living in the home, she would rent out another bedroom. In December 2010, two clients were living in her home. The clients had paid rent up until March 2011, but one had moved out by the time the fire occurred. After the fire, she filed an unusual incident/injury report with the licensing agency.

### b. The Purchase of Insurance and Succeeding Fire

In November or December of 2010, Betty went to a Cost-U-Less store in Hayward. Her policy had lapsed and she needed to secure new insurance to obtain a mortgage modification. At the store, she spoke to a man on the telephone who asked her three questions: (1) the year the house was built, (2) the home's square footage, and (3) whether the electric panel used fuses or circuit breakers. The man said he was from InsZone. She was not given any forms to fill out. She was not asked whether she had a business in the home or who lived there. The man said he would call her back. On her way home, he called and said she needed to pay $125. She made the payment. About a week later, the same man called her and asked her to return to the Cost-U-Less store and call him from there. When she called him, he told her he could not issue the insurance policy. He explained that because her husband's name was on the deed, Jerry would have to initiate the insurance. When she said he was in Stockton, the man said Jerry could go to a Cost-U-Less store in Stockton and say that he had been sent there.

Shortly thereafter, plaintiffs went to the Cost-U-Less store in Stockton. Consistent with Jerry's testimony, Betty testified that all of the paperwork shown to them was blank. The employee just pointed to the places on the papers where he wanted Jerry to sign.

7

They were not asked about electrical panels, whether the structure was occupied by more than one family, if there were roommates or boarders in the home, or whether a business was conducted on the property.

After the fire, Betty went to the Red Cross and they helped her contact Fidelity to make a claim. She met with Anderson the following afternoon. Later, when she received letters from Fidelity indicating that it was going to rescind the policy, she contacted the state insurance commission and was advised to retain an insurance adjustor or an attorney. A contractor referred her to an insurance adjustor named Kevin Dawson. She retained him immediately. He handled all the communications with Fidelity after that.

On cross-examination, Betty admitted she filed a petition for bankruptcy in 2012 under the name Malika Masouda. The filing reflects that two men were seeking thousands of dollars from her claiming they had been employed by On the Right Path.[12] In the petition, she did not identify Jerry as a co-debtor or as her spouse. She also did not disclose that she had filed the instant lawsuit or that her home had suffered a fire.[13]

### 4. Kevin Dawson

Dawson is an insurance adjustor with Professional Insurance Evaluations. He is licensed by the Department of Insurance (DOI) to represent policyholders in disputes with insurers. He is compensated on a contingency basis. In the present case, he and plaintiffs agreed he would get 15 percent of any recovery. He asserted he was testifying both as a "non-retained expert" and as an advocate for plaintiffs.

Dawson was retained by plaintiffs after Betty came to him with a copy of Charlston's letter. Dawson was concerned because the letter did not include a copy of the

---

[12] The two men had made claims with the Labor Commission. They were eventually determined not to be her employees.

[13] A fire investigator was unable to determine the cause of the fire because the scene had been disturbed as the fire was being suppressed. The fire originated in a bedroom in the finished basement. The house reportedly had two electrical boxes with fuses, one in the garage and one in the pantry.

application containing the alleged misrepresentations. He discussed the letter with Betty and came to believe that Charlston's assertions were untrue. Specifically, he understood the family resided in the home, and that the residence had never been used as a rehabilitation facility or as a halfway house for former prisoners. However, Betty did tell him "there were persons that would live at the house that were referred by an agency who contracted with Alameda County and she would provide short-term housing arrangements for these people who were in a transition, either between the hospital and the homelessness or some other housing program where they needed temporary accommodations and she would receive a stipend."

On cross-examination, Dawson responded affirmatively when asked if he would "present unbiased, unprejudiced testimony." He was asked if the rescission was based on whether plaintiffs lived on the property. Dawson responded: "No. It relies on a claim by Fidelity that on the application of insurance there were misrepresentations and *those four questions weren't on the application*. So, it's false in its foundation this rescission. These were not questions on the application. These are questions that somebody made up and said that Jerry answered wrong." (Emphasis added.) Dawson conceded plaintiffs' property was licensed to provide clients with transitional housing. He also acknowledged that homeowner's insurance is not available for residential care facilities. Instead, such facilities are required to obtain commercial insurance policies that can have a minimum premium of $5,000.[14]

### B. Fidelity's Case

#### 1. Richard Gasparini, Jr.

Richard Gasparini, Jr., is a licensing program analyst with the Department of Social Services' Community Care Licensing Division. His work involves regulating

---

[14] On October 23, 2012, Fidelity filed an unsuccessful motion for nonsuit as to breach of the implied covenant of good faith and fair dealing, agency, punitive damages, breach of contract, and whether Betty had an insurable interest.

residential care facilities in the community by conducting annual inspections and investigating complaints. Residential care facilities usually have a six-bed capacity and look like a normal houses in the community.

Gasparini had visited On the Right Path several times. During one such visit, he was setting up his laptop computer when people came through the front door yelling that they had a search warrant. He was handcuffed and taken out to the street. In connection with that visit he created a report dated December 30, 2009. He also visited plaintiffs' home on February 10, 2011. Later, Betty came to his office and told him about the fire. She said several times that she wanted to relocate the facility to another house.

### 2. *James LaRosa*

James LaRosa is a deputy sheriff with the Alameda County Sheriff's Office. On several occasions he was called to investigate missing persons who had been clients of On the Right Path. On December 26, 2010, he was dispatched to the property on report of a missing patient at risk. On another occasion, he arrested one of plaintiffs' sons for a domestic violence incident. He also participated in the execution of a no-knock warrant. During the search of the premises, he contacted at least two patients who said that they lived in the residence. A county caseworker was also present.

### 3. *Robert Lockefeer*

Robert Lockefeer was employed as a producer for InsZone when plaintiffs purchased the Fidelity policy. He testified that a producer is someone who quotes, secures, and issues insurance policies on behalf of a customer. InsZone primarily works with its customers over the phone. Lockefeer is licensed by the state to sell property casualty insurance, including homeowner policies.

InsZone contracted with a number of different insurers, including Fidelity. Approximately 90 to 95 percent of Lockefeer's customers were referred by Cost-U-Less. He would receive a call or an email from an employee at a Cost-U-Less store regarding a potential customer. He would then speak with the individual about the risks they were

10

seeking to insure. He received about seven to 10 such calls a day. The calls would normally last between 10 minutes to half an hour. It would typically take an hour and 15 minutes to an hour and a half to go through the entire application process. Lockefeer did not recall having spoken with plaintiffs. However, he did not have any reason to doubt InsZone's identification of him as the producer who had placed plaintiffs' policy.

For homeowner policies, Lockefeer would inquire as to the property's address, the square footage of the home, the year the home was built, whether the property already had insurance, whether the customer had any pets, the size of the garage, and whether there was a swimming pool. He would always ask about home businesses because customers who ran businesses out of their homes would not be eligible for a homeowner's policy with any of InsZone's carriers. He would also ask if the home had circuit breakers or fuses. If the home had fuses, it would probably also not be eligible for coverage. He worked off his own questionnaire, filling it out as he spoke with the customer. The questionnaire was basically a data-collection sheet that allowed him to have all the information he needed on a single page. He would then input the information using a computer program that would generate quotes from all of InsZone's carriers.

If a customer wanted to purchase coverage from Fidelity, Lockefeer would fill out an online application using Fidelity's website. He had a username and password for the site. The online form required answers to 43 questions. Among the questions was whether the electrical panel utilizes circuit breakers or fuses, and whether there were any roommates or boarders in the home. It was his practice to ask the customer each the questions appearing on Fidelity's website. All 43 questions had to be answered in order for the application to be transmitted successfully.

After the application was transmitted, a printout would be generated to show how Fidelity's questions had been answered. The printout was made on an ACORD form. An ACORD form is a generic homeowner insurance application. The boxes on the ACORD form itself would not be filled out because Fidelity's questionnaire was printed

11

out at the same time with the questions populated with the applicant's answers. Lockefeer understood the ACORD boxes were left blank because filling out that form would have been "awfully redundant." After the customer signed the printed form it would be transmitted back to Lockefeer's office where he would also sign it. When all the prerequisites had been completed, the application documents signed, and payment information obtained, the policy would be submitted electronically and Fidelity's website would generate a policy number. A receipt for the transaction would also be created.[15] As part of the application process, customers also would receive and sign a privacy agreement.

Lockefeer stated he would not have been able to generate an accurate quote by asking a customer only three questions. Specifically, he would need more information than just the square footage of the house, the year it was built, and whether it used fuses or circuit breakers. He also testified that he would never have submitted answers to the online application that were not authorized by the client. It would not be in his interest to do so because if the policy were to be rescinded or cancelled, he would lose his commission. He stated he had never falsified an application.[16]

### 4. Bruce LeBlanc

Bruce LeBlanc evaluates policies to ensure they meet Fidelity's underwriting guidelines. He confirmed that insurance brokers use Fidelity's website to complete online applications. The application program is called Fidelity Rating and Internet Service Technology (F.I.R.S.T.). It automatically quotes and underwrites policies in real-time. Some of the questions on the application are underwriting questions and others are

---

[15] The InsZone receipt signed by Jerry and Lockefeer was introduced at trial.

[16] An auditor for the insurance management company that oversees InsZone confirmed that plaintiffs' insurance application included the generic ACORD form. The application would have been filled out using a computer and printed out using the ACORD form. The customer would review the form and sign it before the application was submitted to the carrier. Both the ACORD form and Fidelity's online questionnaire would have been sent to the customer at the Cost-U-Less store.

rating questions. The rating questions pertain to the quote for the premium on a specific policy. The underwriting questions are intended to qualify the risk for acceptance. The broker obtains the relevant information from the applicant and inputs it into the F.I.R.S.T. system. Once the application is submitted, the broker can print the signature page off the Internet and have the applicant sign it. The system will not approve applications that have unacceptable underwriting responses.

LeBlanc testified the records did not show that more than one Fidelity policy had ever been issued to plaintiffs. A subsequent investigation indicated that four of the questions on plaintiffs' submission had been answered incorrectly. Had the correct answers been given, the policy would not have been issued.

### 5. Edward MacCubbin

Edward MacCubbin is an investigator with Fidelity's special investigations unit. He was assigned to investigate plaintiffs' claim. In reviewing an online news article about the fire, he noted there might have been a business at the property because it appeared a resident employee and some unrelated clients also lived at the property. He was told to investigate plaintiffs' insurance application because it appeared there were inconsistencies that needed to be evaluated.

MacCubbin discovered plaintiffs had filed a bankruptcy petition three days prior to the fire. The petition indicated that Betty was employed with On the Right Path, which was identified as having the same address as the subject property. He passed the information on to LeBlanc and asked him to evaluate whether the inconsistencies he had found would have had any bearing on Fidelity's acceptance of the policy. MacCubbin concluded a business was being operated on the property, the property contained fuses, and more than one family resided there. He presented the results of his investigation to management and to legal counsel.

13

### 6. Roy Pollock

Roy Pollock testified as an expert witness with respect to insurance industry practices. He stated the use of automated online underwriting systems, like the one used in this case, is becoming more prevalent in the industry. ACORD applications are typically used in conjunction with an individual insurance company's separate and more detailed application.

### C. Motions After Close Of Evidence

InsZone brought a motion for directed verdict as to plaintiffs' claim for negligence, asserting no evidence had been presented to suggest that it fell below the standard of care in its application process. It noted even plaintiffs' own expert (Dawson) had agreed on cross-examination that InsZone did not do anything wrong or act negligently with respect to the application process. Fidelity's expert, Pollock, had also stated that there was no evidence to suggest InsZone had misrepresented anything in the application. The motion for directed verdict was granted.

Fidelity also brought a motion for directed verdict, asserting that plaintiffs' claim for damages failed because they never submitted sworn proofs of loss and inventory. The motion was denied.

### D. Jury Verdicts

On October 31, 2012, the jury, using a special verdict form, concluded plaintiffs' application for insurance did not contain any misrepresentations of fact. The jury found Fidelity liable to plaintiffs for $298,924.28 for the loss of real property, $110,000 for the loss of personal property, and $15,600 for loss of use. It also determined Fidelity's failure to pay the covered losses under the policy was unreasonable or without proper cause. The jury allocated $3,600 in damages for additional loss of use and $300,000 for emotional distress. Attorney fees were awarded in the amount of $101,885.83.

As to punitive damages, the jury found Fidelity had acted with fraud, malice, or oppression by withholding or delaying the payment of policy benefits, and that these acts were authorized by one or more of Fidelity's officers, directors, or managing agents.

On November 5, 2012, the jury awarded plaintiffs $1.9 million in punitive damages.

Judgment was entered on the jury verdict on November 29, 2012.

### E.  Post-Trial Motions

Fidelity moved for judgment notwithstanding the verdict (JNOV) and new trial on several grounds, including that the jury had been given erroneous jury instructions and verdict forms.  It further argued Dawson's testimony should have been disregarded because his contingency agreement created an inherent conflict of interest.  It also claimed the issue of punitive damages should not have been submitted to the jury as there was no evidence that the acts of any of Fidelity's employees had been ratified at the corporate management level.

On January 16, 2013, the trial court issued its order granting the motion for JNOV in part and denying the motion for new trial.  The court granted the JNOV as to the $1.9 million award for punitive damages, the awards of $15,600 and $3,600 for loss of use, and imposed a corresponding reduction in the amount awarded for attorney fees.  The court modified the judgment accordingly.

On January 25, 2013, the trial court filed a corrected and amended judgment in the amount of $823,881.52.  These consolidated appeals followed.

### DISCUSSION

Because we find it dispositive, we address Fidelity's appeal of the order denying its motion for new trial.[17]  Fidelity asserts the trial court erred in failing to grant its

---

[17] Fidelity asserts "substantial evidence supported material misrepresentations mandating JNOV."  Had the trial court granted Fidelity's motion as to this issue, this argument would be compelling.  However, the standard of review on appeal of an order denying a

15

motion because the jury was prevented from deciding whether InsZone was plaintiffs'

broker. The significance of this issue is that an affirmative finding would have allowed

the jury to hold plaintiffs responsible for *any* misrepresentations in the insurance

application, whether attributable to them directly or indirectly through InsZone's

conduct.[18] Specifically, Fidelity claims the court below erred in failing to give its version

of CACI No. 2307, which addresses whether InsZone was Fidelity's agent. It also asserts

the court's version of CACI No. 2308 misstated the law regarding the affirmative defense

of rescission, in part because it required Fidelity to prove plaintiffs themselves had

intentionally made all four alleged misrepresentations, whereas the law permits insurers

to rescind for a single innocent or negligent misrepresentation. It asks us to reverse the

judgment and remand the matter for a new trial on the grounds that the jury instructions

and related verdict forms were prejudicial and resulted in a miscarriage of justice.

## I. *Standard of Review*

While this court generally reviews orders concerning new trials for abuse of

discretion (*Howard v. Thrifty Drug & Discount Stores* (1995) 10 Cal.4th 424, 443;

*People v. Davis* (1995) 10 Cal.4th 463, 524), any determination underlying the order is

scrutinized under the test appropriate for that determination. (*City of San Diego v. D.R.

Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 678.) Here, the

underlying issues on appeal—whether the jury instructions misstated the law and whether

the trial court erred in refusing to allow the jury to consider whether InsZone's conduct

party's JNOV motion is *not* whether substantial evidence supports the verdict that the jury did *not* render. Rather, the inquiry is whether substantial evidence, contradicted or uncontradicted, supports the jury's finding of fact. Because Fidelity has not properly framed its argument concerning the court's partial denial of its JNOV motion, we construe Fidelity's appeal as arising from the denial of its motion for new trial.

[18] The trial court was not persuaded by this argument, emphasizing that "the jury did not find any misrepresentations . . . ." As will appear, however, the court's reasoning is somewhat circular, as the jury's findings were based on a flawed jury instruction that omitted consideration of InsZone's role with respect to the policy transaction.

16

could be imputed to plaintiffs—are analyzed de novo. (See *Ibid.*; *People v. Posey* (2004) 32 Cal.4th 193, 218.)

A party is entitled to request that the jury be instructed correctly on any of the party's theories of the case that are supported by substantial evidence. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 (*Soule*).) A refusal to instruct the jury is reversible error if it is probable that the error prejudicially affected the verdict. (*Id*. at p. 580.)

## II. *Misrepresentations As An Affirmative Defense*

### A. *General Principles*

It is well established that material misrepresentations or concealment of material facts in an application for insurance entitle an insurer to rescind an insurance policy, even if the misrepresentations are not intentionally made.[19] (Ins. Code, §§ 331[20] ["[c]oncealment, whether intentional or unintentional, entitles the injured party to rescind insurance"]; 359 ["[i]f a representation is false in a material point, whether affirmative or promissory, the injured party is entitled to rescind the contract from the time the representation becomes false"]; see also *O'Riordan v. Federal Kemper Life Assurance Co.* (2005) 36 Cal.4th 281, 286-287; *Mitchell, supra,* 127 Cal.App.4th 457, 467-468.) Additionally, "[a] misrepresentation or concealment of a material fact in an insurance application also establishes a complete defense in an action on the policy. [Citations.] As with rescission, an insurer seeking to invalidate a policy based on a material misrepresentation or concealment as a defense need not show an intent to deceive. [Citations.]" (*Superior Dispatch, Inc. v. Insurance Corp. of New York* (2010) 181 Cal.App.4th 175, 192, fn. omitted (*Superior Dispatch*).)

---

[19] "Freedom of contract and the right of an insurer to make an informed decision whether or not to insure a given risk are strong policy considerations that support more liberal rescission rights for misrepresentations made at the inception of the insurance contract." (*Mitchell v. United National Ins. Co.* (2005) 127 Cal.App.4th 457, 472 (*Mitchell*).)

[20] All further statutory references are to the Insurance Code except as otherwise indicated.

To prevail, the insurer must prove that the insured made a material "false representation" in an insurance application. "A representation is false when the facts fail to correspond with its assertions or stipulations." (§ 358.) The test for materiality of the misrepresentation or concealment is the same as it is for rescission, "a misrepresentation or concealment is material if a truthful statement would have affected the insurer's underwriting decision." (*Superior Dispatch, supra,* 181 Cal.App.4th at p. 191, citing *Thompson v. Occidental Life Ins. Co.* (1973) 9 Cal.3d 904, 916; see *Cohen v. Penn Mutual Life Ins. Co.* (1957) 48 Cal.2d 720, 725-726.)

### B. Evidence Supports Fidelity's Misrepresentation Theory

Using a special verdict form, the jury answered the following question in the negative: "Did the application for insurance with [Fidelity] by Jerry and Betty Douglas contain a misrepresentation of fact?" It would appear that either the jury found the allegedly false statements were true, or it concluded the application Jerry signed did not contain any misrepresentations. The first possibility is questionable. Even construed in the light most favorable to plaintiffs, it is undisputed that during the pendency of the policy Betty used the home to provide room and board to mentally ill clients pursuant to a license she obtained from a social services agency.

The evidence presented at trial would support a finding that plaintiffs were licensed to operate a residential care facility out of their home and that they received money in exchange for providing room and board to mentally ill clients.[21] For example, the unusual incident/injury report that Betty submitted to the licensing agency after the fire states that two male clients were residing in the home at the time of the fire. Also, Dawson testified that he knew "there was one or more rooms rented out or shared by boarders on occasion. I do know that. And I do know that there was a Social Service

---

[21] The insurance policy issued to plaintiffs defines "business," in part as either "[a] trade, profession or occupation engaged in on a full-time, part-time or occasional basis," or "[a]ny other activity engaged in for money or other compensation . . . ."

18

agency working with Betty Douglas to provide housing for people who were transitional between hospital and homelessness. I know that." When asked whether "[u]sing a definition of a residential care facility is a licensed entity by the State of California that allows it to accept income from a social service agency in exchange for providing a place to board. Is it your understanding that that type of facility is being operated at the Locust Street property in 2011?", Dawson replied, "[i]f ['] facility['] is that operation of having persons residing in the home and being funded by the state, if that's your definition of facility, I say that may have occurred."

We also note plaintiffs' counsel essentially stipulated, outside the presence of the jury, that Betty was running a business out of her home. Towards the end of the trial, the following dialogue occurred: The court: "Let me ask counsel for plaintiff, notwithstanding any argument about what [Betty] said, are you going to be arguing to the jury that she wasn't running a business?" Plaintiffs' counsel responded: "No, your honor, it's admitted." In sum, the evidenced offered at trial supports the conclusion that three of the four answers provided to Fidelity during the application process were false, namely, that no boarders lived in the home, that the home was not occupied by more than one family, and that the home was not being used to run a business.

## C. InsZone's Status As Broker Or Agent

We turn to examine whether the jury should have been allowed to consider whether InsZone was acting as plaintiffs' broker during the policy transaction. The significance of this issue is critical to the merits of the present case. As a matter of law, "if [an insurance] application was prepared by an insurance broker (the agent of the insured), the application's contents are the insured's responsibility." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2013) ¶ 2:83, p. 2-46 (rev. # 1, 2011); accord, *Imperial Casualty & Indemnity Co. v. Sogomonian* (1988) 198 Cal.App.3d 169, 178-179 [policyholders liable for misrepresentations in broker-prepared application]; see also *LA Sound USA, Inc. v. St. Paul Fire & Marine Ins. Co.* (2007) 156

19

Cal.App.4th 1259, 1268 ["LA Sound, not its broker, is responsible for the misrepresentations in the application"].)

Persons or entities who solicit, sell, or negotiate insurance contracts are known generically as "producers." Producers fall into two broad classifications: insurance agents and insurance brokers. (See *Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 932, fn. 4 (*Krumme*).)[22] " 'An "insurance broker" is one who acts as a middleman between the insured and the insurer, soliciting insurance from the public under no employment from any special company, and, upon securing an order, placing it with a company selected by the insured or with a company selected by himself or herself; whereas an "insurance agent" is one who represents an insurer under an employment by it. A broker is, in essence, employed in each instance as a special agent for a single purpose, while the very definition of agent indicates an ongoing and continuous relationship. . . . [B]rokers and insureds are ordinarily involved in what can be viewed as a series of discrete transactions, while agents and insureds tend to be under some duty to each other during the entire length of the relationship.' [Citations.]" (*Id.* at p. 929.)

An agent's primary duty is to represent the insurer in transactions with insurance applicants and policyholders. (*Marsh & McLennan of Cal., Inc. v. City of Los Angeles* (1976) 62 Cal.App.3d 108, 117-118 (*Marsh*).) Each company the agent represents must file a notice of appointment with the DOI's commissioner. (§ 1704.) Because an agent represents the insurer, an agent's representations to an insured regarding coverage are treated as representations by the insurer. Generally, some hallmarks of an insurance agent (as opposed to a broker) are licensure, notice of appointment as an agent and the power to bind the insurer. (*Marsh, supra,* at pp. 118-119.) In contrast, a broker's

---

[22] "Statutorily, an agent is defined as one who is 'authorized, by and on behalf of an insurer, to transact all classes of insurance' except for life insurance (§§ 31, 1621) while a broker is 'a person who, for compensation and on behalf of another person, transacts insurance other than life with, but not on behalf of, an insurer.' (§§ 33, 1623.)" (*Krumme, supra,* 123 Cal.App.4th 924, 928-929.)

20

primary duty is to represent the applicant/insured, and his or her actions are not generally binding on the insurer. "Put quite simply, insurance brokers, with no binding authority, are *not* agents of insurance companies, but are rather independent contractors . . . ." (*Marsh, supra,* at p. 118, italics added.) Of course, these labels alone are not determinative of the relationship, and the specific facts of each transaction must be reviewed. (*Arocho v. California Fair Plan Ins. Co.* (2005) 134 Cal.App.4th 461, 466.) The general laws of agency inform any such review. (*Sanchez v. Lindsey Morden Claims Services, Inc.* (1999) 72 Cal.App.4th 249, 255.)

Plaintiffs assert the evidence unequivocally shows that InsZone was not a broker. They cite to the independent producer agreement between InsZone and Fidelity. The agreement states, in part: "Producer shall *never* be deemed an agent for the Company or Insurance Company *unless required by law*. Producer has no authority to bind Company or Insurance Company on any insurance policy *except as otherwise stated* in the underwriting guidelines for the territories and lines of business set forth on Compensation Schedule." (Italics added.) The Compensation Schedule provides that InsZone was authorized "to bind policies for the lines of business listed below and the Company shall pay Producer a commission based on the following table . . . ." The table includes homeowner's policies in California. Relying on *Marsh, supra*, plaintiffs assert that this power to bind "means the producer is [an] agent." Plaintiffs claim, "had the jury decided the agent/broker issue, it would have found InsZone was a producing agent for Fidelity, thus gutting the proposed affirmative defense." In our view, the issue is not as clear cut as plaintiffs suggest.

We observe both insurance agents and insurance brokers must be licensed by the DOI (§ 1631), but a person may not act as an insurance agent without a notice of the agent's appointment by the insurer to transact business on its behalf filed with the DOI. (§ 1704, subd. (a); *Loehr v. Great Republic Ins. Co.* (1990) 226 Cal.App.3d 727, 732-733.) It is unclear whether Lockefeer or InsZone was covered by such notice.

21

Additionally, the producer agreement is ambiguous insofar as it states explicitly that InsZone was "never" to be deemed Fidelity's agent, except as "required by law." It also appears that a jury could conclude Lockefeer did not bind the policy himself, since it was Fidelity's website that generated the policy number (see *Krumme, supra,* 123 Cal.App.4th 924, 929, citing *Marsh, supra,* 62 Cal.App.3d 108, 118 [" 'a broker does not execute a policy *without a prior authorization from the insurer.* In contrast, the agent is authorized to execute the binder himself.' [Citation.]"], italics added.) Because there was substantial evidence to support a finding that Lockefeer was acting as a broker rather than an agent, we agree with Fidelity that the jury should have been allowed to make a determination of this issue.[23]

## III. Jury Instructions Given and Refused

### A. CACI No. 2307

Fidelity proposed the following instruction, which is based on CACI No. 2307: "Insurance Agency Relationship Disputed": "Jerry and Betty Douglas claim that [InsZone] was [Fidelity's] agent and that [Fidelity] is therefore responsible for [InsZone's] representations. [¶] If Jerry and Betty Douglas prove that [Fidelity] gave [InsZone] the authority to act on behalf of [Fidelity], then [InsZone] was [Fidelity's] agent. This authority may be shown by words or may be implied by the parties' conduct. This authority cannot be shown by the words of Jerry and Betty Douglas alone. [¶] [Fidelity] and [InsZone] both agree that [InsZone] is a producer or a broker and that [InsZone] did not have authority to act on behalf of [Fidelity]."

After the parties rested, the trial court expressed the view that InsZone could be held liable for failing to ask plaintiffs all of the necessary questions as part of the insurance application. The court noted: "The jury could conclude this whole thing is because they had an agent that didn't do his job, which is not the fault of Fidelity. [¶] I

---

[23] We also note Lockefeer testified that he generally sought to obtain quotes from multiple insurers, suggesting he was not an agent of any one insurance company.

know there's some talk about whether InsZone was the agent for the defendant, *but [the jurors] might conclude that it's not.* That's why I think the verdict forms need to be redone to reflect that possibility because right now it doesn't." (Italics added.) Subsequently, the court indicated it would not give the final paragraph of the proposed instruction, which is not included in the model instruction. It opined that the proposed language was an improper attempt "to get the court to rule on a matter of law that they didn't have authority to act on behalf of the agents [*sic*] *and I think that's an issue for the jury*." (Italics added.) The court also stated that the instruction would be moot if the court granted InsZone's motion for directed verdict, which it later did.

We note the last line of the second paragraph of the proposed instruction appears to be flawed. In the Judicial Council's version, that sentence references the agent, not the insured: "This authority cannot be shown by the words of [name of agent] alone." (CACI No. 2307.) Even if properly drafted, however, the instruction does not stand for the proposition asserted by Fidelity. It requires plaintiffs to prove InsZone was Fidelity's agent whereas, for purposes of the affirmative defense asserted here, Fidelity was required to prove InsZone was plaintiffs' broker. Had the instruction been given, it would have had no effect on Fidelity's affirmative defense because even if the jury found plaintiffs failed to meet their burden of proving InsZone was Fidelity's agent, the jury would not thereby have concluded that InsZone was plaintiffs' broker because the instruction does not require that such a finding be made. Even viewed in the light most favorable to Fidelity, at best, the jury would have deemed InsZone a free-standing third party. Accordingly, we cannot conclude the trial court erred in failing to give this instruction.[24]

---

[24] We do not hold, however, that the issue was thereby waived by Fidelity. After granting InsZone's motion for directed verdict, the court clearly stated, over Fidelity's protests, that it would not allow the jury to consider InsZone's conduct at all. Thus, any attempt by Fidelity to propose a better crafted instruction would have been futile.

### B. CACI No. 2308

We reach a different conclusion with respect to the instruction given by the trial court on rescission. CACI No. 2308 was given to the jury as follows: "[Fidelity] claims that no insurance contract was created because Jerry and Betty Douglas made a false representation in their application for insurance. To establish this claim, [Fidelity] must prove all of the following: [¶] One, that Jerry and Betty Douglas submitted application for insurance with [Fidelity]. [¶] Two, that in the application for insurance, Jerry and Betty Douglas represented that: (A) there is no unit in the structure occupied by more than one family; (B) the electrical panel utilizes circuit breakers and not fuses; (C) there are no roommates or boarders in the house and/or the house is not used as a rooming or boarding house; (D) there is no business conducted on the property. [¶] Three, the application asks for that information. [¶] Four, that Jerry and Betty Douglas knew that one or more of these representations were not true. [¶] Five, [Fidelity] would not have issued the insurance policy if Jerry and Betty Douglas had stated the true facts in the application. [¶] Six, that [Fidelity] gave Jerry and Betty Douglas notice that it was rescinding the insurance policy. [¶] And, seven, that [Fidelity] offered to return the insurance premium paid by Jerry and Betty Douglas."

Before the instruction was read to the jury, Fidelity's attorney told the trial court that the first element "should say Jerry and Betty Douglas, but I think it should also say InsZone Insurance Services since that's the broker who ultimately submits the application online to Fidelity." She also stated that the word "application" should be changed to "applications." Plaintiffs' counsel countered stating, "[w]e think the way the Court's drafted it is appropriate. Jerry Douglas is the one who submitted a signed application." Fidelity's counsel responded, noting that, "[a]t the end of the day, the buck stops with the [broker] as to what information was submitted to the carrier. Fidelity doesn't underwrite its own policies like that, it has an online system, it's undisputed how the information is obtained. InsZone goes online, has a user name and password and submits the

24

information." The court responded: "You may include, every time I mention Jerry Douglas you may include Jerry and Betty Douglas. Other than that, this is what we're going to use for 2308."

Fidelity had proposed its own version of 2308. The instruction proposed by Fidelity states: "[Fidelity] claims that it is entitled to rescind the homeowners' policy it issued to Jerry Douglas because of concealment (whether intentional or unintentional) by [plaintiffs] and/or [InsZone], when [plaintiffs] applied for the policy of homeowners' insurance. The court will determine whether [Fidelity] is entitled to rescission based upon your findings. You must determine whether [Fidelity] has established each of the following by a preponderance of the evidence: [¶] 1. Whether [plaintiffs] and/or [InsZone] concealed material facts (whether intentionally or unintentionally) or failed to advise [Fidelity] of material facts when [plaintiffs] applied for the homeowners' insurance policy; and [¶] 2. If you find that the facts were concealed (intentionally or unintentionally) whether such facts were material; and [¶] 3. If [Fidelity] had known any material facts concealed or not disclosed, it would probably and reasonably not have issued the homeowners' insurance policy."

Fidelity also requested special verdict forms regarding InsZone's disputed agency that would have allowed the jury to find in favor of Fidelity even if the misrepresentations were deemed unintentional. The trial court refused to give the proposed special verdict form and did not allow the jury to otherwise consider the import of any unintentional misrepresentations. The court also believed it did not need to include InsZone along with Jerry and Betty as a party who provided the allegedly false information to Fidelity in the application. Based on the state of the law discussed above, we agree with Fidelity that the instruction given by the court below erroneously omitted these two key points.

25

Plaintiffs argue that the jury's verdict moots any error regarding the affirmative defense because the jury concluded the application contained no misrepresentations.[25] However, the problem is that the trial court's instruction and verdict form referenced only one application, which, from the jury's inquiry, appears to have created ambiguity as to whether the jury could consider the responses provided in the F.I.R.S.T. questionnaire. The instruction also did not reflect Fidelity's theory that InsZone's conduct in supplying the allegedly erroneous information could be attributed to plaintiffs. Finally, the instruction was legally erroneous in that it required the jury to find the misrepresentations were intentional, as opposed to negligent or inadvertent.

Next plaintiffs assert Fidelity never pursued the proposed affirmative defense at trial and affirmatively waived the right to present expert testimony in support of the defense. Yet the entire trial was centered on the allegedly erroneous information Fidelity received, either from plaintiffs or InsZone, and whether its rescission was justified based on the faulty information. As to whether expert testimony was required, it appears to us that the issue for the jury, under properly given instructions, is relatively straightforward: were the challenged statements untrue and, if so, were the misrepresentations material? Contrary to plaintiffs assertions, there was no need to delve into whether InsZone's conduct fell below the standard of care. If InsZone was plaintiffs' broker, and if it supplied untrue information to Fidelity that was material to the underwriting process, then Fidelity would have had the right to rescind the policy regardless of whether InsZone acted negligently or not.

Plaintiffs claim Fidelity never pursued its position that InsZone was plaintiffs broker because it "never suggested Lockefeer may have filled out the underwriting

---

[25] Plaintiffs also claim Fidelity forfeited the affirmative defense by failing to plead it in its answer. We disagree. Fidelity asserted that it had the right to rescind the policy because the underwriting information it received was untrue. Fidelity was not required to identify the actors who supplied the information at the pleading stage.

questionnaire or that he supplied Fidelity with materially false answers to those questions." But it is undisputed that Lockefeer *did* fill out the questionnaire and that he *did* provide the responses that plaintiffs have conceded are false. Thus, the only controverted issue is whether InsZone was a broker acting on behalf of plaintiffs or an agent acting on behalf of Fidelity. This critical issue was unaddressed by the jury instructions, requiring reversal for a new trial. While plaintiffs claim the evidence "uniformly and unambiguously" supports the conclusion that InsZone was not a broker, the facts are not entirely one-sided.

## IV. *The Error Was Prejudicial*

Having concluded the trial court erred in instructing the jury, we turn to whether the errors were prejudicial. "When deciding whether an instructional error was prejudicial, 'we must examine the evidence, the arguments, and other factors to determine whether it is reasonably probable that instructions allowing application of an erroneous theory actually misled the jury.' [Citation.] A 'reasonable probability' in this context 'does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility.' [Citation.]" (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 682, italics omitted.) We review the evidence in the light most favorable to the appellant and assume that, had it been properly instructed, the jury might have believed the evidence upon which the rejected instruction was based, drawn inferences favorable to appellant, and rendered a different verdict. (*Logacz v. Limansky* (1999) 71 Cal.App.4th 1149, 1156.)

As to the state of the evidence, we have already summarized the testimony and documentary evidence offered to support Fidelity's view that misrepresentations were made during the application process, either by plaintiffs or by InsZone. These misrepresentations relate plaintiffs' use of the home to operate a licensed adult residential care facility by offering and providing room and board to mentally ill clients in exchange for money. Additionally, there was evidence, albeit conflicting, that InsZone and

27

Lockefeer acted as plaintiffs' insurance brokers, and not as agents of Fidelity. Our review of the record indicates a reasonable probability that a properly instructed jury could have rendered a different verdict.

The instructional errors noted above were exacerbated by plaintiffs' counsel's closing arguments. He repeatedly asserted the "application" was the blank form Jerry had signed, emphasizing that this form did not include the disputed underwriting questions: "I want to show you the actual jury instruction, which is what Judge Gee will be giving you in this case so that we are absolutely clear what it is that you have to decide. Look at number [one], that Jerry and Betty Douglas submitted an application for insurance with Fidelity. Well, now they want to say it's not really the application, it's the underwriting in question, maybe InsZone's responsible for it. *The law says it has to be an application submitted by Jerry and Betty Douglas.* The only application in evidence is the two-page application. It doesn't have any misrepresentations at all on it. They were instructed just to sign it blank. [¶] *Fidelity creates an application and gives it to InsZone to be signed. This is what they wanted. It provides a nice pretext if you want to rescind someone's policy to say, wow, you signed a blank application, it doesn't have any answers on it.* That's Fidelity setting it up. That's what I meant when you go back and deliberate in the courtroom this afternoon (sic), you have to follow the law, not the arguments of counsel. But you have to *look at the application and see if it actually has in there misrepresentations about anything that we've talked about today because it doesn't.*" (Italics added.) In discussing punitive damages, he also argued the questions Fidelity had relied on to rescind the policy were not on the application but "dragged out of Fidelity's underwriting system."[26]

---

[26] We note Fidelity was not necessarily required to prove that the misrepresentations it relied on in issuing the policy were contained within an application. (See *Superior Dispatch, supra,* 181 Cal.App.4th 175, 191 ["A misrepresentation or concealment of a material fact *in connection with* an application for insurance is grounds for rescission of the policy."], italics added.)

28

Plaintiffs' counsel also touched on the agency issue: "I have to just address I think that Fidelity's counsel must have used 'broker' five, 10, 15 times in his closing argument; however, you saw the Producer Agreement that talked about agency, that talked about the ability to bind the insurance company, that talked about the ability . . . that InsZone binds those applications for Fidelity. *Trying to bring InsZone into this and blame it on InsZone or Jerry and Betty Douglas is inappropriate*."

We also note it appears the jury may have been mislead by the use of the term "application" in the instruction because the jurors asked for a definition of that word during deliberations. We note Fidelity's proposed instruction did not include the word "application." The online process utilized here generated documents evidencing the answers to the underwriting questions that Fidelity relied on in issuing the policy. Limiting the jury's consideration to the representations made by plaintiffs in Jerry's application alone was misleading and prejudicial.

There is no dispute that Jerry's signature appears on the second page of a blank pre-printed ACORD application, that is, an ACORD form containing unchecked boxes. His signature also appears on the third page of a printout of the questionnaire underneath language authorizing the insurer to inspect the home. The 43 underwriting questions and answers appear on the first two pages only. None of the questions or accompanying answers are printed on the page he signed. Thus, Jerry's testimony that he never saw the Fidelity underwriting questionnaire generated by InsZone is not implausible, and, under the instruction given, the jurors could have concluded there were no misrepresentations in Jerry's "application" because there were no representations at all on the blank pages that he signed. Importantly, the jury was not asked to consider whether the F.I.R.S.T. application submitted by InsZone on plaintiffs' behalf via Fidelity's website contained any material misrepresentations. Additionally, the instructions and jury form required Fidelity to prove that the misrepresentations were made deliberately. Thus, Fidelity's

29

affirmative defense was not properly presented to the jury and we conclude Fidelity was prejudiced thereby, necessitating a new trial.

Reversal of the judgment obviates the need to address plaintiffs' appeal of the trial court's decision to strike the punitive damages award. We also need not address Fidelity's appeal from the motion to tax costs.

### DISPOSITION

The judgment is reversed and the cause is remanded to the trial court for proceedings not inconsistent with this opinion.


_____
Dondero, J.


We concur:


_____
Margulies, Acting P. J.


_____
Becton, J.[*]


_____
[*] Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:                                 Alameda County Superior Court

Trial Judge:                                 Hon. Delbert C. Gee

Counsel for Plaintiffs and Appellants,
   and for Plaintiffs and Respondents:     Hereford Kerley,
                                 and J. Edward Kerley

                                 Law Office of Dylan Schaffer,
                                 and Dylan Schaffer

Counsel for Defendant
   and Appellant:                        Shoecraft Burton,
                                 and Michelle L. Burton